UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DON SAGESSE,

                   Plaintiff,

         v.

THE CITY OF NEW YORK, POLICE
OFFICER JOHN DOE #1, and POLICE
OFFICER JOHN DOE #2,

                   Defendants.

No. 22-CV-8414 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

Plaintiff Don Sagesse ("Plaintiff") brings this action under 42 U.S.C. § 1983 against the City of New York ("the City") and Police Officers John Doe #1 and #2, later identified as Officers Michael Stackpole and Basim Elsawaby. Defendants now move for summary judgment. For the reasons that follow, Defendants' motion is granted, and the case is dismissed.

**FACTUAL BACKGROUND**

The following facts are undisputed unless otherwise noted. On April 27, 2022, Plaintiff's brother-in-law reported to the New York City Police Department that Plaintiff had verbally threatened to kill him and his wife, Plaintiff's sister. Defs.' 56.1 Statement ¶ 1; Gottstein Decl. (ECF No. 17), Ex. B, at 1–2.[1] Almost three months later, on July 20, 2022, Officers Stackpole and Elsawaby (herein, "the officers") went to Plaintiff's residence and arrested him, having probable cause based on the report. Defs.' 56.1 Statement ¶¶ 2–3. Defendants state that Elsawaby gave Plaintiff the opportunity to go to the police precinct voluntarily, but Plaintiff disputes that

---

[1] Plaintiff does not admit or deny "what the substance of the Complaint entailed." Pl.'s Resp. to Defs.' 56.1 Statement ¶ 1.

Elsawaby provided him an opportunity to ride to the precinct without handcuffs. *Id.* ¶ 4; Pl.'s Resp. to Defs.' 56.1 Statement ¶ 4.

Elsawaby then attempted to place Plaintiff in handcuffs. Defs.' 56.1 Statement ¶ 5. Defendants state that when Elsawaby reached for Plaintiff's left hand, Plaintiff stepped back and pulled his arm away, *id.* ¶¶ 6–7, to which Plaintiff responds that Elsawaby was able to grab hold of his left hand "right away." Pl.'s Resp. to Defs.' 56.1 Statement ¶ 7. Defendants further assert that Plaintiff ignored Elsawaby's multiple instructions to put his hands behind his back. Defs.' 56.1 Statement ¶¶ 10–11, 13. Plaintiff claims that, to the extent these allegations insinuate that he attempted to resist arrest, that was not the case; instead, Plaintiff points out that the officers were able to handcuff him within fifteen seconds. Pl.'s Resp. to Defs.' 56.1 Statement ¶¶ 10–11. Ultimately, Stackpole helped Plaintiff's right hand into the handcuffs, and the handcuffs were secured. Defs.' 56.1 Statement ¶¶ 12, 14–15. Defendants describe Plaintiff as "agitated," "irate[]," and "yelling" after being handcuffed; Plaintiff disputes this characterization. *Id.* ¶¶ 16–17; Pl.'s Resp. to Defs.' 56.1 Statement ¶¶ 16–17.

After Plaintiff was in handcuffs, both officers led him to the police vehicle. Defendants assert, and Plaintiff disputes, that Plaintiff stepped back in an attempt to grab hold of the doorknob. Defs.' 56.1 Statement ¶¶ 18, 23; Pl.'s Resp. to Defs.' 56.1 Statement ¶¶ 18, 23. Plaintiff does not dispute, however, that he "leaned back in resistance to Officer Elsawaby's attempt to escort him down the steps" outside his home toward the vehicle. Defs.' 56.1 Statement ¶ 26. Once at the vehicle, Defendants asked Plaintiff five different times to take a seat inside. *Id.* ¶¶ 29, 31. Plaintiff did not comply and instead asked why he was being arrested. *Id.* ¶ 30. Eventually, Plaintiff was seated in the vehicle, but he kept his right leg and elbow sticking out, preventing the officers from closing the door. *Id.* ¶¶ 32–35.

Once finally secured in the vehicle, the officers drove Plaintiff to the police precinct. *Id.* ¶ 36. Stackpole drove and Elsawaby sat in the backseat next to Plaintiff. *Id.* Throughout the course of the ride, Plaintiff criticized the officers and the criminal justice system more broadly. *See, e.g.*, Gottstein Decl. Ex. E, at 11:28–18:45; 19:12–21:56; 30:19–43. About two minutes into the drive, Plaintiff began to squirm, wiggle his hands and fingers, and occasionally lean forward. Defs.' 56.1 Statement ¶ 39. About thirteen minutes from when Plaintiff was originally placed in handcuffs, *see* Gottstein Decl. Ex. E, at 5:25, Plaintiff stated, "This too tight. Gonna kill my blood circulation to my hand. That's gonna be another lawsuit," *id.* at 18:42–49.[2] About three minutes later, Plaintiff asked Elsawaby if he could "loosen this up," referring to the handcuffs. *Id.* ¶ 41. Elsawaby responded that he could loosen the handcuffs at the precinct, but not in the vehicle. Defs.' 56.1 Statement ¶ 42. Plaintiff then said that his hands were "getting numb" and asked Elsawaby again to loosen the handcuffs. *Id.* ¶ 43. Once again, Elsawaby replied that he could not loosen the cuffs while in the vehicle, but would do so at the precinct, which would be "in about five minutes." Defs.' 56.1 Statement ¶¶ 44–45. Elsawaby also suggested that Plaintiff lean forward with his head against the headrest so as to alleviate the pressure on his hands. *Id.* ¶ 46. Defendants maintain that Plaintiff declined Elsawaby's suggestion; Plaintiff states that he attempted to lean forward but was unable to do so. *Id.* ¶ 47; Pl.'s Resp. to Defs.' 56.1 Statement ¶ 47. Although it is unclear whether it alleviated the pressure on Plaintiff's hands, the video does show Plaintiff leaning forward during the ride. *See* Gottstein Decl. Ex. E, at 23:53–56; 26:17–21.

At one point, Plaintiff leaned his body in Elsawaby's direction. Defs.' 56.1 Statement ¶ 49. In response, Elsawaby reached across Plaintiff and told him to sit back. *Id.* ¶ 50. Elsawaby then suggested for a second time that Plaintiff lean forward to alleviate pressure on the handcuffs. *Id.*

---

[2] Neither party raises this statement in their briefing or in their 56.1 statements, but it is apparent from Elsawaby's body camera footage.

3

¶ 51. Plaintiff, instead, sat on an angle, leaning his torso back against his seat, and said, "this feels a little better for now." *Id.* ¶ 52. Eventually, Plaintiff did lean forward for two to four seconds with his head against the headrest of the seat in front of him, and then sat back again. *Id.* ¶ 53. Plaintiff contends that "it was physically not possible for [him] to maintain that position." Pl.'s Resp. to Defs.' 56.1 Statement ¶ 53.

According to Defendants, at this point, Stackpole was driving faster, employing the vehicle's sirens in order to "get to the precinct and remove the handcuffs quicker." Defs.' 56.1 Statement ¶¶ 54–55. Elsawaby told Plaintiff, "we're trying to get you there faster so you can get out of the handcuffs." *Id.* ¶ 54. Upon arrival at the precinct, Elsawaby helped Plaintiff out of the vehicle, checked him in with the desk sergeant, then brought him to a holding cell area. Defs.' 56.1 Statement ¶¶ 58, 61, 63, 68. Defendants point out that Plaintiff did not complain about the tightness of the handcuffs or numbness in his hands when he was before the desk sergeant. *Id.* ¶ 67. They also note that body camera video shows that there was a gap between the top of Plaintiff's right wrist and the handcuff, indicating that the handcuffs had not been fastened too tightly. *Id.* ¶ 59; Gottstein Decl. Ex. G. Plaintiff disputes that there is any visible gap between the handcuffs and his wrists. Pl.'s Resp. to Defs.' 56.1 Statement ¶ 59. Once in the holding cell, Elsawaby removed Plaintiff's handcuffs. *Id.* ¶¶ 68–71.

Plaintiff asserts that as a result of the handcuffing, he "was diagnosed with an injury to his right wrist[,] which he contends could only have been caused by handcuffs." Pl.'s Opp'n at 1–2; *see also id.* at 3 n.2. Medical records introduced by Plaintiff with his Opposition show that he was seen in an emergency room "as soon as he [was] re[]leased from [the] NYPD." Padilla Decl. Ex. A, at 4. These records also indicate that he has "a radial sensory nerve compression injury" in his right wrist and "decrease[d] sensation to radial sensory distribution." *Id.* at 2. Additionally, an

"[e]valuation of the left median sensory and the right median sensory nerves showed prolonged distal peak latency . . . and decreased conduction velocity." *Id.* at 5.

## PROCEDURAL BACKGROUND

Plaintiff filed this suit on October 3, 2022, bringing claims under 42 U.S.C. § 1983. First, Plaintiff sued all Defendants for using excessive force in violation of his Fourth and Fourteenth Amendments rights. Second, Plaintiff alleged a municipal liability claim against the City. Following an unsuccessful mediation pursuant to Local Rule 83.1, the parties submitted a joint letter informing the Court that Defendants planned to submit a fully dispositive motion for summary judgment, and that "[t]he parties agree that no additional discovery is needed for the Court's consideration on [D]efendants' anticipated motion," which would be based on the limited evidence, including the body camera footage, already exchanged. Joint Letter 2, ECF No. 10. After Defendants moved for summary judgment on both counts, Plaintiff "concede[d] his claim for municipal liability" but continued to oppose summary judgment as to his claim for excessive force. Opp'n at 4–5.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[3] A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *WWBITV, Inc. v. Vill. of Rouses Point*, 589 F.3d 46, 49 (2d Cir. 2009). In determining whether there is a genuine issue of material fact, the Court must view all facts in the light most favorable to the nonmoving party. *See Holcomb v. Iona*

---

[3] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, omissions, and alterations.

5

*Coll.*, 521 F.3d 130, 132 (2d Cir. 2008). However, where a defendant has moved for summary judgment, a plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Where the record contains "a videotape capturing the events in question," and there "are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened," a court should "view[] the facts in the light depicted by the videotape" instead of as told by a discredited, nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378–81 (2007); *see also Pratt v. Nat'l R.R. Passenger Corp.*, 709 F. App'x 33, 34 (2d Cir. 2017) (holding that "objective video . . . evidence furnished by the Defendants on summary judgment was sufficient to overcome all contrary eyewitness testimony and preclude any genuine dispute of material fact"). Where video evidence, however, "casts significant doubt on [a] plaintiff's version of the events, [but] a reasonable juror could credit [the] plaintiff's account," *Zachary v. City of Newburgh*, No. 13-cv-5737, 2016 WL 4030925, at *7 (S.D.N.Y. July 25, 2016), "the video evidence is not so conclusive as to determine [a] factual dispute as a matter of law," *Rasin v. City of New York*, No. 14-cv-5771, 2016 WL 2596038, at *7 (E.D.N.Y. May 4, 2016).

## DISCUSSION

### I. Legal Standard

An excessive-force claim arising in the context of an arrest is "properly characterized as one invoking the protections of the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 394 (1989). In assessing whether the force an officer used is "reasonable," a court must balance "the nature and quality of intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." *Id.* at 396. This is a fact-specific inquiry which

"requires careful attention to the facts and circumstances of each particular case, including" (1) "the severity of the crime at issue," (2) "whether the suspect pose[d] an immediate threat to the safety of the officers or others," and (3) "whether he [was] actively resisting or attempting to evade arrest by flight." *Id.* In considering these factors, a court must bear in mind that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* at 396.

Whether the amount of force used was "reasonable" is an objective inquiry, and "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.* at 397. "The continuum along which the excessiveness of force in making an arrest is assessed is not marked by visible signposts." *Brown v. City of New York*, 798 F.3d 94, 103 (2d Cir. 2015). On summary judgment, a court therefore must "determine whether a jury, instructed as to the relevant factors, could reasonably find that the force used was excessive." *Id.*

When evaluating the reasonableness of the force employed while handcuffing a plaintiff, the "broad[]" question is "whether an officer reasonably should have known during handcuffing that his use of force was excessive." *Cugini v. City of New York*, 941 F.3d 604, 613 (2d Cir. 2019). "A plaintiff satisfies this requirement if either the unreasonableness of the force used was apparent under the circumstances, or the plaintiff signaled [his] distress, verbally or otherwise, such that a reasonable officer would have been aware of [his] pain, or both." *Id.* at 613. Such "analysis is not limited to a factual checklist," though a consideration of certain factors "may, indeed, prove

useful," including: (1) whether "the arrestee's handcuffs were unreasonably tight," (2) whether "the defendants ignored the arrestee's pleas that the handcuffs were too tight," and (3) "the degree of injury to the arrestee's wrists." *Id.* at 612–13.

## II. Application

Although the Second Circuit has declined "to adopt a *per se* rule that the use of handcuffs in effecting an arrest is always reasonable," *Soares v. State of Conn.*, 8 F.3d 917, 921 (2d Cir. 1993), neither party disputes that "the officers had a lawful right to place [P]laintiff in handcuffs," Pl.'s Opp'n at 3. At issue is thus whether the "severity of [the] intrusion"—that the officers did not remove or loosen Plaintiff's handcuffs at the time he complained of their tightness and waited until they were at the precinct to do so—"was unjustified." *Cugini*, 941 F.3d at 614.

Each of the factors set forth in *Graham* weighs in Defendants' favor. First, as to the severity of the crime at issue, *see Graham*, 490 U.S. at 396, the parties do not dispute that the officers had probable cause to arrest Plaintiff on the basis of a complaint made by his brother-in-law to the NYPD that Plaintiff had threatened to kill him and his wife. *See* Pl.'s Resp. to Defs.' 56.1 Statement ¶¶ 1–3. The threat was specific and violent. *See* Defs.' 56.1 Statement ¶ 3 (indicating that the officers understood the underlying crime involved Plaintiff's "threatening to slit his sister's and brother-in-law's throats and kill them"). Plaintiff points to the fact that he was suspected of a misdemeanor and not a felony, but a misdemeanor classification alone does not render the underlying crime at issue non-severe. *See Williams v. Nat'l R.R. Passenger Corp. (Amtrak)*, 830 F. App'x 46, 49 (2d Cir. 2020) (holding that the first *Graham* factor favored a defendant officer who kept a plaintiff handcuffed for a prolonged period of time, even though the plaintiff's underlying crime might potentially be characterized as a class A misdemeanor).

Second, as to whether Plaintiff posed an immediate threat to the officers' safety, *Graham*,

490 U.S. at 396, he does not dispute that, during the ride, he was squirming and moving his hands "in a way that Officer Elsawaby could not see what his hands were doing." Pl.'s Resp. to Defs.' 56.1 Statement ¶ 39. Plaintiff's "maneuvering the handcuffs" out of Elsawaby's sight, instead of keeping them directly behind his back, "may . . . be viewed as aggressive and threatening" in that it could put the safety of an officer at risk. *See Ambrose v. Korines*, No. 03-cv-411, 2005 WL 1962027, at *2 (E.D.N.Y. Aug. 9, 2005). Leaving Plaintiff handcuffed in light of this "maneuvering" was also reasonable where, after "complain[ing] of his discomfort," officers "told [the plaintiff] that he would have to wait a short time until the handcuffs could be removed." *Id.*

Additionally, at one point, Plaintiff leaned his body towards Elsawaby in a manner that put him "just inches away," Defs.' 56.1 Statement ¶ 49, making it reasonable for Elsawaby to believe that his safety may be in danger if he removed or loosened Plaintiff's handcuffs. And Plaintiff verbally told officers, both before he was handcuffed and while in the vehicle, that he planned not to comply with the booking process at the precinct nor to appear in court. *See* Defs.' 56.1 Statement ¶¶ 20–22, 27–28, 56–57. Such protestations further support the reasonableness of the officers' decision to keep Plaintiff handcuffed. *See Johnson v. Unity Health Sys.*, No. 07-cv-6141, 2013 WL 12308497, at *2, *6–7 (W.D.N.Y. Mar. 29, 2013) (holding that, where a plaintiff expressed that she would not voluntarily comply with a "mental health arrest" after an officer "explain[ed] the procedure," the officer did not "violate [the] plaintiff's right to be free from excessive force" by requiring her to wear handcuffs while transported to the hospital despite her complaint that they were too tight).

Third, although the parties dispute the extent to which Plaintiff resisted arrest, *Graham*, 490 U.S. at 396, the undisputed facts illustrate that he did resist arrest by failing to immediately cooperate as the officers attempted to handcuff him, and by engaging in conduct that made it

9

difficult for the officers to put him in the police vehicle. While Plaintiff's acts of resistance were not violent, they were enough to merit the officers' use of correspondingly minimal force. For example, Plaintiff concedes or does not dispute the following facts:

- That that the officers had to instruct him to put his hands behind his back three times before he allowed them to cuff both of his hands. Pl.'s Resp. to Defs.' 56.1 Statement ¶ 14.

- That he told the officers that he would not cooperate with them five times before he was brought to the police vehicle. *Id.* ¶ 22.

- That, as the officers led him down the driveway, he "leaned back *in resistance* to Officer Elsawaby's attempt to escort him down the steps." *Id.* ¶ 26 (emphasis added).

- That Elsawaby had to ask Plaintiff "to have a seat in the car five times before [he] sat down in the car." *Id.* ¶ 31.

- That "[o]nce [he] was finally seated in the car, he kept his right leg sticking out of the car and planted on the road, so that the officers could not close the door to drive to the precinct." *Id.* ¶ 32.

- That after Elsawaby got both of Plaintiff's legs in the car and "let go of [his] right leg, [P]laintiff moved his right leg back outwards so that it would be in the way of the door closing and kept his right elbow sticking out of the car doorway." *Id.* ¶¶ 32, 35.

- "[T]hat [P]laintiff's attitude was less th[a]n cooperative during the underlying arrest," Pl.'s Opp'n at 4, and, in fact, that "his attitude may have been combative," *id.* at 5.

Such actions constitute resistance that weigh in favor of Defendants. *See Kalfus v. N.Y. & Presbyterian Hosp.*, 476 F. App'x 877, 880–81 (2d Cir. 2012) (holding that a plaintiff "resisted arrest by refusing to stand up or to permit himself to be handcuffed").[4]

In concluding that no reasonable juror could find that the officers' actions constituted

---

[4] The Court does not credit Defendants' characterizations of Plaintiff as "irate[ly] protesting arrest" and "yell[ing] in protest," Defs. 56.1 Statement ¶¶ 16–18. Nor does the Court draw an inference from Defendants' undisputed assertion that "[P]laintiff looked down towards Officer Elsawaby's legs and waist," *id.* ¶ 40, that Plaintiff was somehow planning to take Elsawaby's firearm or taser, *see* Defs.' Mot. to Dismiss at 4; Defs.' Reply at 4. As explained above, Plaintiff's undisputed acts of resistance were enough for a reasonable jury to find that the officers' decision to keep Plaintiff in handcuffs during the duration of the car ride was not unreasonable. Nor does the Court credit Defendants' assertion that Plaintiff said, "I'm about to hop out," as that statement does not appear intelligible to the Court in the video. *See* Defs.' Mot. for Summ. J. at 5 n.1; Gottstein Decl. Ex. E, at 24:28–33.

excessive force, the Court has also considered the "evidentiary factors" identified by the Second Circuit as potentially "useful to a district court" when "assessing the soundness of a handcuffing-based excessive force claim." *Cugini*, 941 F.3d at 612–13. First, the officers did not ignore Plaintiff's "pleas that the handcuffs were too tight." *Cugini*, 941 F.3d at 612. Instead, they took steps to mitigate Plaintiff's discomfort. Numerous courts have held that where a plaintiff complains of discomfort during handcuffing and officers take reasonable steps to alleviate the pain, the officers' continued use of handcuffing is not unreasonable. *See Ziming Shen v. City of New York*, 725 F. App'x 7, 11–12 (2d Cir. 2018) (holding that maintaining a suspect in handcuffs during a "very brief" "window" before he was transported to a hospital did not amount to an unreasonable use of force where officers positioned the suspect in a manner that would not exacerbate his shoulder injury); *Forbes v. Doe*, No. 18-cv-6700, 2024 WL 329080, at *8 (W.D.N.Y. Jan. 29, 2024) (holding that there was no evidence that officers acted unreasonably where they "adjusted [the p]laintiff's handcuffs on at least two occasions after [he] complained they were too tight").

Here, to mitigate the pressure on Plaintiff's hands, Elsawaby calmly suggested that Plaintiff lean forward with his head against the headrest in front of him. Defs.' 56.1 Statement ¶¶ 46, 51. Plaintiff does not dispute that Elsawaby made this suggestion; rather, he claims that he was not able to lean forward. Pl.'s Resp. to Defs.' 56.1 Statement ¶¶ 47, 52. But that assertion is contradicted by the video evidence which shows Plaintiff leaning forward—albeit briefly—illustrating that he was able to do so. *See* Gottstein Decl. Ex. E, at 26:17–21. The video also shows that he had ample room in the vehicle to do so. *See, e.g.*, *id.* at 23:53–56 (depicting Plaintiff leaning forward with his head close to the headrest in front of him before beginning to squirm).

After Plaintiff complained about the handcuffs, the officers also began driving to the precinct more quickly. Stackpole put on his siren and increased his speed and Elsawaby informed

11

Plaintiff that they were "trying to get [him] there faster so [he] c[ould] get out of the handcuffs." Defs.' 56.1 Statement ¶ 54; *see also id.* ¶ 55. Once at the precinct, Elsawaby promptly removed the handcuffs. *See id.* ¶¶ 61–63, 68–69; *see also* Gottstein Decl. Ex. E, at 31:10–35:10 (indicating that four minutes elapsed between parking at the precinct and removing Plaintiff's handcuffs in a holding cell).

As to whether the handcuffs were unreasonably tight, *Cugini*, 941 F.3d at 612, the Court is mindful that "to be effective[,] handcuffs must be tight enough to prevent the arrestee's hands from slipping out," *Grant v. City of New York*, 500 F. Supp. 2d 211, 217 (S.D.N.Y. 2007). The video evidence here establishes that there was some space between the handcuffs and Plaintiff's wrist, supporting the conclusion that they were not unreasonably tight. *See* Defs.' 56.1 Statement ¶ 59; *see also* Gottstein Decl. Ex. E, at 31:40–42; *id.* at Ex. G. Furthermore, after Plaintiff initially complained that the handcuffs were too tight, he shifted his position and stated that he "fe[lt] a little better for now." Defs.' 56.1 Statement ¶ 52.

Finally, although Plaintiff presents evidence that he suffered injuries to his wrists, *Cugini*, 941 F.3d at 612, "reasonable force does not become unconstitutional merely because it caused the plaintiff serious injury," *Ferraresso v. Town of Granby*, 646 F. Supp. 2d 296, 308 (D. Conn. 2009). For example, in *Ferraresso*, the plaintiff presented medical evidence showing that he suffered a shoulder injury during handcuffing. *Id.* at 303, 308. Even so, the court granted summary judgment for the defendants because there was "no proof" that the officer "twist[ed] [the plaintiff's] left arm and plac[ed] it behind his back[] us[ing] force that would constitute a constitutional violation." *Id.* Similarly, in *Sanders v. City of Rochester*, 360 F. Supp. 3d 152, 167 (W.D.N.Y. 2019), the court held that, "[a]ccepting as true [the plaintiff's] assertion that her wrists and hands were injured and she continues to have pain as a result of the handcuffs, those facts, alone, are insufficient to survive

summary judgment on her excessive force claim because there is no evidence the officers used more force than necessary to detain [her]." *See also Forbes*, 2024 WL 329080, at *8 (denying summary judgment for a plaintiff claiming he suffered "pain and wrist injuries that led to carpal tunnel syndrome" where no evidence showed it was unreasonable for the officers to have handcuffed him).

For these reasons, Elsawaby and Stackpole's decision to keep Plaintiff in handcuffs during the car ride to the precinct without loosening them did not constitute a "degree of force" that could be "objectively considered[] disproportionate and unwarranted under the circumstances." *Cugini*, 941 F.3d at 614. The Court therefore finds that no reasonable jury could conclude that Elsawaby and Stackpole used excessive force.[5]

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 16 and close this case.

Dated:   March 28, 2024
         New York, New York

                                                    Ronnie Abrams
                                                    United States District Judge

---

[5] Because the Court concludes that Plaintiff's excessive-force claim fails as a matter of law, it need not address Defendants' cursory argument that the officers are entitled to qualified immunity. *See Ziming Shen v. City of New York*, 725 F. App'x 7, 12 & n.2 (2d Cir. 2018); Defs.' Reply at 6–7. For the same reason, the Court also need not address Defendants' argument that Plaintiff's excessive-force claim fails on the ground Plaintiff did not timely amend his complaint to identify the "John Doe" Defendants. *See* Defs.' Reply at 5–6.